*If this opinion indicates that it is "FOR PUBLICATION," it is subject to
revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

UNPUBLISHED
January 14, 2021

Plaintiff-Appellee,

v

No. 350129
Washtenaw Circuit Court
LC No. 18-000828-FH

CHARLES EDWARD HORN,

Defendant-Appellant.

Before: SWARTZLE, P.J., and RONAYNE KRAUSE and RICK, JJ.

PER CURIAM.

Defendant, Charles Edward Horn, appeals as of right his convictions of reckless driving causing death and reckless driving causing impairment of a bodily function. Defendant rear-ended a yellow fire truck that was parked on the expressway, protecting the emergency responders who were assisting on the scene of an earlier automobile accident. Defendant's backseat passenger died in the high-speed crash, and his frontseat passenger was severely injured. The prosecution's theory was that defendant was texting and driving. On appeal, defendant argues that the jury's verdict was against the great weight of the evidence or, in the alternative, that there was insufficient evidence that defendant was driving recklessly. Defendant also argues that there was juror bias, and his trial counsel was ineffective for failing to challenge several jurors for cause. Concluding that defendant's claims fail on this record, we affirm.

## I. BACKGROUND

Christopher Skupny, a paramedic with the Northville City Fire Department, testified that he responded to a rollover motor-vehicle accident occurring shortly before 11:00 p.m. on May 29, 2017, on the I-94 expressway. A Department of Natural Resources officer was already on site and his vehicle's flashing lights remained activated. The Ypsilanti Fire Department also responded with a small pickup truck and a bright yellow fire truck. Both vehicles also kept their emergency lights on. The fire engine angled itself partially in the shoulder of the traffic lane and partially in the road itself. After Skupny had stabilized the patient from the initial accident, he observed the fire engine "lurch forward," and he heard "a very loud but very short bang, like an explosion" and realized that another vehicle had crashed into the fire truck. Three individuals in that vehicle were

-1-

in critical condition. Skupny described the crashed vehicle as "partially imbedded into the rear of Ypsilianti's fire engine." The front passenger "was conscious, breathing, and had a pulse." The backseat passenger was unconscious and not breathing. The paramedic's lifesaving measures were unsuccessful. Skupny acknowledged that he did not see the collision and did not witness the driver of the vehicle—defendant—driving erratically. Nor was there any indication that defendant had been under the influence of any drugs or alcohol. The fire engine had been on the scene for approximately 15 minutes before the crash.

Christopher McIntosh, a detective trooper with the Michigan State Police (MSP), testified that he was also dispatched to the initial rollover crash. Detective McIntosh described how the various emergency-response vehicles were parked and how their emergency lights were activated. He also described the road as straight and stated that he was able to observe the emergency vehicles from some distance, as there were no visibility impediments. When the detective arrived on site, he observed the vehicle that had crashed into the back of the fire truck, a crash which occurred between the initial dispatch for the rollover accident and his arrival at the scene. The detective's police vehicle was equipped with a camera that recorded his arrival, and the jury viewed the 19-minute video. The detective was going about 61 miles per hour when he began proceeding westbound on I-94. He did not see the crash and did not see defendant driving. The video was recording at 11:02:08 p.m. The detective was able to identify defendant as the driver, MH—defendant's daughter—as the front-seat passenger, and another individual, CS, as the passenger-side, rear-seat passenger. The detective described the emergency scene as "clearly visible from a long distance." On cross-examination, the detective acknowledged that he did not see any evidence of erratic driving and that there was no indication that defendant was under the influence of alcohol or drug use. The detective did not recall seeing a semi-truck that might have obstructed defendant's visibility.

Matthew Tingley, a road-patrol officer with the MSP, responded to the scene after the second crash and assisted with the investigation. Trooper Tingley testified that there was no evidence of skid marks or gouge marks that would suggest that defendant tried to brake or swerve. The trooper also described it as "a long, straight, intact roadway." There was nothing preventing a driver from transferring to the clear lane to avoid the fire truck. In defendant's vehicle, Trooper Tingley found a cell phone wedged in between the dashboard and the windshield. He identified it as defendant's phone because of a picture on the home screen, and he deactivated it to preserve the battery, securing the phone in evidence. The ensuing investigation revealed that defendant had been "texting back and forth" with another individual, DB, "most of that day and night." Law enforcement obtained a search warrant for the text messages, and discovered that defendant sent a text message to DB at 11:01:34 p.m. The distance from the on-ramp to the crash scene was approximately .6 miles. The trooper calculated that, driving at the speed limit, it would take approximately 34 seconds to travel this distance. The crash was called in at 11:02:08 p.m.

On cross-examination, the trooper affirmed that there was no sign of drug or alcohol use. The trooper agreed that if there was intervening traffic, such as a semi-truck, it may have impeded defendant's view. In the trooper's belief, all the available evidence clearly pointed to defendant "getting on the freeway, staying in that right lane until running into the back of a fire truck."

Sergeant Allan Avery, a traffic reconstructionist for the MSP, testified that he was also unable to identify any signs that defendant attempted to brake or make an evasive maneuver. He

described how the fire engine's parking technique was normal and was done "to add a buffer zone for the people who are working on the road and the highway." He described the roadway as a "standard freeway, three-lane freeway," straight and with "very good" visibility. In Sergeant Avery's experience and in light of the physical evidence, defendant's vehicle was operating between 50 and 70 miles per hour at the time of the collision, which he described as "a hard, hard hit." The vehicle pushed the fire truck forward two or three feet.

The evidence demonstrated that defendant was in the right lane and that the crash would not have occurred if defendant had moved over to the center lane. Sergeant Avery testified that 34 seconds would have given a driver enough time to stop while traveling 50 to 70 miles per hour, that 34 seconds "is an eternity" in his line of work, and that this suggested recklessness on the part of the driver. Even slowing down to 25 miles per hour would have likely resulted in a collision that the vehicle occupants would have probably "walked away from," and swerving would have probably resulted in, at most, a fender bender. Sergeant Avery stated that, generally, a person is able to perceive and react in 1.5 to 1.6 seconds. Anything longer than 2 seconds would normally indicate intoxication or distraction. He acknowledged that there could have been braking, but there was no evidence of it, and the evidence suggested that defendant was not paying attention. The sergeant acknowledged there was no evidence of intoxication in this case.

DB also testified for the prosecution, confirming that he and defendant had repeatedly communicated by text message and phone on the night of the crash. Defendant's daughter was DB's ex-girlfriend. DB described defendant as being upset and claimed that defendant had used "fighting words" because defendant wanted him to leave his daughter alone.

Dr. Jeffrey Jentzen, the Washtenaw County Medical Examiner, testified that she performed an autopsy on CS and found that she died as the result of multiple traumatic injuries sustained in the crash. In the doctor's expert opinion, because CS was wearing a seatbelt, a lower-velocity collision would have likely resulted only in "bruises and scrapes."

Defendant did not testify. His only witness was his daughter, MH. She testified that defendant's cell phone was in the vehicle's cupholder at the time of the crash. She recalled that CS yelled, "Oh shit, Chucky," as her father was merging onto the highway. She did not recognize that they had crashed into a fire truck. She did not see any emergency lights before the crash occurred. She claimed that defendant's hands were on the steering wheel, and denied that her father was angry. She thought he was "happy" as they "were just talking and laughing." On cross-examination, MH acknowledged that she had sustained serious injuries in the crash that continued to have a major impact on her life. She admitted that she had used marijuana earlier that night, but she denied that she used opiates. She also admitted that she was on her phone for most of the drive, including the moment immediately preceding the crash, and that she did not drive. She believed her father was looking to move into the left lane.

After MH's testimony, the prosecutor recalled Trooper Tingley. He testified that MH had not previously asserted that defendant's phone was in the cupholder at the time of the crash. He also confirmed that, despite her denial of opiate use, MH's hospital records reflected that she tested positive for both cannabinoids and opiates.

The jury convicted defendant of reckless driving causing death, MCL 257.626(4); and reckless driving causing impairment of a bodily function, MCL 257.626(3). The trial court sentenced defendant, as a fourth-offense habitual offender, MCL 769.12, to serve 10 to 30 years in prison for the causing-death offense, and to serve 8 to 25 years in prison for the causing-impairment offense.

This appeal followed.

## II. ANALYSIS

### A. SUFFICIENCY OF THE EVIDENCE

Defendant first argues that the evidence was insufficient to support his convictions. This Court reviews de novo challenges to the sufficiency of the evidence. *People v Meissner*, 294 Mich App 438, 452; 812 NW2d 37 (2011). When determining whether sufficient evidence has been presented to sustain a conviction, a court must view the evidence in a light most favorable to the prosecutor and determine whether any rational trier of fact could have found that the essential elements of the crime were proven beyond a reasonable doubt. *People v Wolfe*, 440 Mich 508, 515; 489 NW2d 748 (1992). "Circumstantial evidence and reasonable inferences that arise from such evidence can constitute satisfactory proof of the elements of a crime." *People v Kanaan*, 278 Mich App 594, 619; 751 NW2d 57 (2008). Further, this Court "will not interfere with the trier of fact's role of determining the weight of the evidence or the credibility of witnesses." *Id.*

MCL 257.626 provides in pertinent part:

(1) A person who violates this section is guilty of reckless driving punishable as provided in this section.

(2) Except as otherwise provided in this section, a person who operates a vehicle upon a highway or a frozen public lake, stream, or pond or other place open to the general public, including, but not limited to, an area designated for the parking of motor vehicles, in willful or wanton disregard for the safety of persons or property is guilty of a misdemeanor punishable by imprisonment for not more than 93 days or a fine of not more than $500.00, or both.

(3) Beginning October 31, 2010, a person who operates a vehicle in violation of subsection (2) and by the operation of that vehicle causes serious impairment of a body function to another person is guilty of a felony punishable by imprisonment for not more than 5 years or a fine of not less than $1,000.00 or more than $5,000.00, or both. . . .

(4) Beginning October 31, 2010, a person who operates a vehicle in violation of subsection (2) and by the operation of that vehicle causes the death of another person is guilty of a felony punishable by imprisonment for not more than 15 years or a fine of not less than $2,500.00 or more than $10,000.00, or both. . . . [MCL 257.626(1)-(4).]

In this case, defendant concedes that he was operating a vehicle on a highway open to the public and that his operation of the vehicle caused the death of one person and the serious impairment of another. Defendant argues only that the prosecutor did not establish that his operation of the vehicle was "in willful or wanton disregard for the safety of persons or property" as required by the statute.

" 'Willful or wanton disregard' means more than simple carelessness but does not require proof of an intent to cause harm." *People v Carll*, 322 Mich App 690, 695; 915 NW2d 387 (2018). "It means knowingly disregarding the possible risks to the safety of people or property." *Id.* In *Carll*, this Court held that when evidence showed that the defendant "drove through a stop sign at high speed without any attempt to brake and that he might have even accelerated into the intersection," the jury could fairly conclude that the defendant acted "with wanton disregard of the potential consequences, i.e., death and serious injury."

Viewing the evidence in this case in a light most favorable to the prosecutor, there was sufficient evidence to allow a rational jury to find defendant guilty beyond a reasonable doubt on both counts. A rational jury could have concluded that the collision was the result of distracted driving while operating a vehicle at highway speeds. The prosecutor did not need to prove an intent to cause harm; rather, all that was required was knowingly disregarding the possible risks of injury. *Id.* at 695. Phone records showed that defendant's cell phone sent a text message at 11:01:34 p.m. The crash was called in at 11:02:08 p.m. The jury heard uncontested evidence that the average perception or response time is between 1.5 and 1.6 seconds and that defendant— assuming that he was proceeding at the speed limit—had 34 seconds from the time he entered onto the highway until the scene of the crash approximately .6 miles down the highway from the on-ramp, which was more than enough time to bring the vehicle to a complete stop or to change lanes. The fire truck was bright yellow, parked in a standard technique to assure the safety of emergency responders, and had its emergency lights flashing, as did at least one other emergency response vehicle. The roadway was straight, and there was good visibility that night. Despite this, there was no evidence suggesting that defendant ever perceived the fire engine or that he attempted to brake or change lanes to avoid a collision. Given this evidence, the jury could fairly conclude that the defendant was operating the vehicle "with wanton disregard of the potential consequences, i.e., death and serious injury." See *id.* at 698.

## B. GREAT WEIGHT OF THE EVIDENCE

Defendant next argues that his convictions were against the great weight of the evidence. Defendant did not preserve this claim for appellate review, and thus we review the claim for plain error affecting his substantial rights. *People v Cameron*, 291 Mich App 599, 618; 806 NW2d 371 (2011).

> A verdict is against the great weight of the evidence and a new trial should be granted when the evidence preponderates heavily against the verdict and a serious miscarriage of justice would otherwise result. Generally, a verdict may only be vacated when the verdict is not reasonably supported by the evidence, but rather it is more likely attributable to factors outside the record, such as passion, prejudice, sympathy, or other extraneous considerations. Questions regarding credibility are not sufficient grounds for relief *unless* the testimony contradicts indisputable facts

or laws, the testimony is patently incredible or defies physical realities, the testimony is material and . . . so inherently implausible that it could not be believed by a reasonable juror, or the testimony has been seriously impeached and the case is marked by uncertainties and discrepancies. [*People v Solloway*, 316 Mich App 174, 182-183; 891 NW2d 255 (2016) (cleaned up).]

Defendant does not cite any basis for why he believes the jury's verdict was attributable to passion, prejudice, sympathy, or other extraneous considerations. Nor does defendant provide any basis for concluding that the testimony presented at trial was inherently implausible. Without any further analysis or elaboration, defendant argues simply that "[t]he evidence preponderates so heavily against the verdicts that it would be a serious miscarriage of justice to permit the verdicts to stand." Based on our review of the record, the jury's verdict was not against the great weight of the evidence.

## C. INEFFECTIVE ASSISTANCE OF COUNSEL

Finally, defendant argues that his trial counsel was ineffective for failing to challenge certain jurors for cause. "This Court reviews de novo whether trial counsel's acts or omissions fell below an objective standard of reasonableness under prevailing professional norms and whether, without the error, the result of the proceedings would have been different." *People v McFarlane*, 325 Mich App 507, 527; 926 NW2d 339 (2018).

"A defendant tried by jury has a right to a fair and impartial jury." *People v Budzyn*, 456 Mich 77, 88; 566 NW2d 229 (1997). "Jurors are presumptively competent and impartial, and the party alleging the disqualification bears the burden of proving its existence." *People v Johnson*, 245 Mich App 243, 256; 631 NW2d 1 (2001). Although "[a] juror's failure to disclose information that the juror should have disclosed may warrant a new trial if the failure to disclose denied the defendant an impartial jury," *People v Rose*, 289 Mich App 499, 529; 808 NW2d 301 (2010), in this case, defendant does not suggest that any jurors withheld information. Rather, defendant only alleges that trial counsel was ineffective for failing to challenge particular jurors because of information that the jurors did disclose during the jury-selection process. Specifically, defendant argues that six jurors were biased on account of having been in car accidents or having had close friends or relatives die in car accidents. Defendant also argues that one juror "made statements about being unsure about his impartiality" and that another juror "knew one of the prosecuting attorneys." Defendant argues that trial counsel's failure to challenge these jurors for cause was objectively unreasonable and deprived him of a fair trial. We find no merit in these arguments.

Jury selection is governed by the Michigan court rules. See MCR 6.412. An "attorney's decisions relating to the selection of jurors generally involve matters of trial strategy." *Johnson*, 245 Mich App at 259. To that end, we have recognized that "[p]erhaps the most important criteria in selecting a jury include a potential juror's facial expressions, body language, and manner of answering questions," *People v Unger*, 278 Mich App 210, 258; 749 NW2d 272 (2008), and that there could also be other strategic considerations implicated in selecting a jury not easily identifiable in an appellate record. For instance, "[d]efense counsel may want to retain certain prospective jurors, especially, and be willing to express satisfaction so the prosecution will not or cannot eliminate them." *People v Robinson*, 154 Mich App 92, 95; 397 NW2d 229 (1986). By way of another example, in cases where it is at best unclear whether a challenge will result in a

stricken juror, defense counsel may—rightly or wrongly—believe "that unsuccessful challenges for cause would not be viewed favorably by the jury." See *id*. at 94. Because we "cannot see the jurors or listen to their answers to voir dire questions" and because "[a] lawyer's hunches, based on his observations, may be as valid as any method of choosing a jury," we have historically "been disinclined to find ineffective assistance of counsel on the basis of an attorney's failure to challenge a juror." See *Unger*, 278 Mich App at 258 (cleaned up). We will not substitute our judgment for that of trial counsel, nor will we use the benefit of hindsight to assess counsel's performance. *Id*.

Moreover, regarding the prejudice prong of the ineffectiveness-of-counsel standard, "jurors with real life experiences, who acknowledge that they can be free of bias and prejudice, can and do make excellent jurors," *Johnson*, 245 Mich App at 256 n 5, and "the juror's promise to keep matters of her personal life separate from defendant's case [is] sufficient to protect defendant's right to a fair trial," see *id*. at 256. Accordingly, when a juror assures the trial court that she can be fair or impartial and the trial court accepts that juror's assurance—absent some other consideration—there is not a reasonable probability that the outcome of the case would have differed if defendant's counsel challenged that juror for cause. See *id*. at 259; *Unger*, 278 Mich App at 257.

Defendant raises an issue regarding one juror who "knew one of the prosecuting attorneys." The record reveals that this juror disclosed that her daughter had attended school with the daughter of one of the prosecuting attorneys. She added that she had not seen that individual in 11 years, and the record reflects that she did not believe that this former relationship would affect her ability to be fair and impartial. Even assuming that a casual acquaintance with one of the prosecuting attorneys, some 11 years in the past, could have raised a question of bias, defendant cannot prove prejudice because of the juror's assurance of impartiality. See *Johnson*, 245 Mich App at 256.

Defendant also argues that six jurors "either had been involved in car accidents or had close friends or relatives die in car accidents." Yet, the jurors agreed that their respective experiences with automobile accidents would not prevent them from being fair and impartial. The jurors' respective assurances of impartiality were sufficient to guarantee defendant's right to a fair and impartial jury and defeat any claim of prejudice. See *Johnson*, 245 Mich App at 256.

In sum, a review of the entire jury-selection process reveals that trial counsel was actively engaged in the questioning of the potential jurors and purposefully worked toward obtaining a fair and impartial jury for his client. The record also shows that trial counsel consulted with his client concerning whether to challenge certain jurors. Trial counsel's lack of objection as to any of the impaneled jurors amounted to trial strategy and does not warrant appellate relief.

Defendant also points to comments attached to an online news article that allegedly described the jury's internal deliberations. It is the general rule, drawn from the common law, that when "alleged misconduct relates to influences internal to the trial proceedings, courts may not invade the sanctity of the deliberative process." See *People v Fletcher*, 260 Mich App 531, 539; 679 NW2d 127 (2004). "The havoc and potential for abuse would be immense if we were to allow counsel to open the jury room door after the jury has been discharged and examine, analyze, and impeach the internal thought processes of the jury." *Hoffman v Spartan Stores, Inc*, 197 Mich App 289, 291; 494 NW2d 811 (1992). "[O]nce a jury has been polled and discharged, its members may not challenge mistakes or misconduct inherent in the verdict." *Budzyn*, 456 Mich at 91.

"Rather, oral testimony or affidavits may only be received on extraneous or outside errors, such as influence by outside parties." *Id.* Absent any evidence of an improper external influence impacting the reliability of the jury's deliberations or resulting verdict, we decline defendant's invitation to invade the sanctity of the deliberative process. See *Fletcher*, 260 Mich App at 539.

Affirmed.

/s/ Brock A. Swartzle
/s/ Amy Ronayne Krause
/s/ Michelle M. Rick